IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **PAUL G. DESABATO**, **ANTHONY DESIMONE**, **BENJAMIN M. PUSATERI, SR.**, and **BELLA CAPELLI ACADEMY, LLC**, | )<br>)<br>)<br>)<br>) |
| Plaintiffs, | ) |
| v. | ) 2:15cv484 |
| | ) **Electronic Filing** |
| **ASSURANCE COMPANY OF AMERICA**, **NORTHERN INSURANCE COMPANY OF NEW YORK**, and **MARYLAND CASUALTY COMPANY**, | )<br>)<br>)<br>) |
| Defendants. | ) |

## OPINION

**I.  INTRODUCTION**

Paul DeSabato, Anthony Desimone, Benjamin Pusateri, Sr., and Bella Capelli Academy, LLC ("BCA") (collectively "plaintiffs") commenced this diversity action against Assurance Company of America, Northern Insurance Company of New York, and Maryland Casualty Company ("defendants") on April 10, 2015.  Plaintiffs seek monetary damages and declaratory relief, alleging defendants breached their duty to defend plaintiffs in an action filed against them in state court.  Defendants counter that their duty to defend never arose.  Presently pending are the parties' cross-motions for summary judgment.  For the reasons set forth below, defendants' motion will be granted and plaintiffs' will be denied.

**II.  STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Rule 56 "'mandates

the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)). Deciding a summary-judgment motion requires the court to view the facts, draw all reasonable inferences, and resolve all doubts in favor of the nonmoving party. Doe v. Cnty. of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001).

The moving party bears the initial burden of identifying evidence that demonstrates the absence of a genuine issue of material fact. When the movant does not bear the burden of proof on the claim, the movant's initial burden may be met by demonstrating the lack of record evidence to support the opponent's claim. Nat'l State Bank v. Fed. Reserve Bank of New York, 979 F.2d 1579, 1581–82 (3d Cir. 1992). Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a *genuine issue for trial*," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in Matsushita). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In meeting its burden of proof, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. The non-moving party "must present affirmative evidence in order to defeat a properly supported motion" . . . "and cannot simply reassert factually unsupported allegations." Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989). Nor can the opponent "merely

2

rely upon conclusory allegations in [its] pleadings or in memoranda and briefs." Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992); Sec. & Exch. Comm'n v. Bonastia, 614 F.2d 908, 914 (3d Cir. 1980) ("[L]egal conclusions, unsupported by documentation of specific facts, are insufficient to create issues of material fact that would preclude summary judgment."). Likewise, mere conjecture or speculation by the party resisting summary judgment will not provide a basis upon which to deny the motion. Robertson v. Allied Signal, Inc., 914 F.2d 360, 382–83 n.12 (3d Cir.1990). Summary judgment may be granted if the non-moving party's evidence is merely colorable or lacks sufficient probative force. Anderson, 477 U.S. at 249–50; see also Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992), cert. denied, 507 U.S. 912 (1993) (although the court is not permitted to weigh facts or competing inferences, it is no longer required to "turn a blind eye" to the weight of the evidence).

The record as read in the light most favorable to plaintiffs establishes the background set forth below.

## III. FACTUAL BACKGROUND

Anthony Vargo ("Vargo"), in 2002, decided to start a school focused on professions in which he had experience: hair styling, cosmetology, and similar services. (Docket No. 28, Ex. A, ¶ 9). To start the school, BCA, Vargo sought and received capital from DeSabato, Desimone, and Pusateri in exchange for equity in BCA.[1] (Docket No. 28, Ex. A., ¶¶ 10–11). Vargo procured the licenses required by the State Board of Cosmetology and ran BCA as its managing member. (Docket No. 28, Ex. A, ¶¶ 15–16). Vargo was an owner and employee of BCA; his designation was "Education Leader." (Docket No. 28, Ex. A, ¶ 16).

---

[1] Two other individuals, Nicholas D'Amico and Eugene Sciulli, also contributed capital to BCA (Docket No.28, Ex. A, ¶ 7). But they are not parties to this action.

3

On March 9, 2009, Vargo attended a meeting with his fellow BCA members. (Docket No. 28, Ex. A, ¶ 17). There, the other members terminated Vargo's BCA employment and ownership interests without warning. (Docket No. 28, Ex. A, ¶ 17). The purported reason was Vargo's "gross misconduct." (Docket No. 28, Ex. A, ¶ 17). A letter handed to Vargo at the meeting stated that he "entered into at least one agreement on behalf of BCA that [he was] not permitted to enter into under the BCA Operating Agreement." (Docket No. 28, Ex. A, ¶ 17).

Vargo had executed a residential lease for a Monroeville apartment on October 10, 2008; he told the landlord during the application process that he was a BCA part owner. (Docket No. 28, Ex. A, ¶ 18). The landlord mistakenly designated BCA as the lessee, rather than Vargo, but Vargo did not notice the mistake when he signed the lease. (Docket No. 28, Ex. A, ¶ 19). Nevertheless, Vargo personally paid all lease-related expenses without using any BCA funds. (Docket No. 28, Ex. A, ¶ 19).

Running out of cash, Vargo, in his personal capacity, terminated the lease early. (Docket No. 28, Ex. A, ¶ 19). Vargo's landlord sent an invoice to BCA's offices requesting payment for Vargo terminating the lease early. (Docket No. 28, Ex. A, ¶ 20). Upon seeing that Vargo purportedly entered into a residential lease on BCA's behalf with an aggregate value over $5,000, the other BCA members determined that Vargo violated section 5.2(j) of the BCA Operating Agreement. (Docket No. 28, Ex. A, ¶ 21; Docket No. 28, Ex. 1 (attached to Ex. A), Sec. 5.2(j)). Even though Vargo told his fellow BCA members that BCA's designation as the lessee was a mistake and that he paid all lease-related expenses from his personal funds, they terminated Vargo's interests in BCA anyway. (Docket No. 28, Ex. A, ¶ 22). BCA's remaining members continued to operate the company using the licenses issued in Vargo's name. (Docket No. 28, Ex. A, ¶ 23).

4

Vargo, as an individual and on BCA's behalf, filed an action against BCA and its remaining members on July 29, 2010, in the Court of Common Pleas of Allegheny County (the "Vargo action"). (Docket Nos. 1; 33, p. 6). Vargo pled several counts including: declaratory judgment, breach of fiduciary duty, conversion, breach of contract, breach of the duty of fair dealing, violations of the Consolidated Omnibus Budget Reconciliation Act of 1986 and the Employee Retirement Income Security Act of 1974, and requested an accounting. (Docket No. 33, pp. 6–7). The Vargo action entered arbitration; the arbitrator awarded Vargo $213,973.54. (Docket No. 33, pp. 6–7).

Defendants insured BCA[2] when the Vargo complaint was filed. (Docket No. 22, p. 1; Docket Nos. 5–6). Defendants refused to defend plaintiffs in the Vargo action. (Docket No. 1, ¶ 24). As a result, plaintiffs incurred legal fees and expenses "of not less than $100,103.70." (Docket No. 1, ¶ 25). Plaintiffs then initiated this action, averring defendants breached their duty to defend. (Docket No. 1).

Through their submissions on summary judgment, the parties narrowed their arguments regarding the duty to defend to the coverage for Personal and Advertising Injury Liability in the applicable Maryland Casualty Company insurance policy (the "Policy"). (Docket No. 27, pp. 1–2). The Policy's relevant sections provide:

> **COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY**
>
> **1.    Insuring Agreement**
>
>   a.    We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We

---

[2] Defendant Maryland Casualty Company is the parent corporation of wholly owned subsidiaries Assurance Company of America and Northern Insurance Company of New York. (Docket Nos. 5–6).

5

will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. . . .

2.  **Exclusions**

    This insurance does not apply to:

    a.  "Personal and advertising injury":

    (1) Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury";

    (2) Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity; . . .

    (6) Arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement"; . . .

**SECTION II – WHO IS AN INSURED**

1.  If you are designated in the Declarations as . . .

    c.  A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

**SECTION V – DEFINITIONS**

1.  "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. . . .

3.  "Bodily injury" means bodily injury, sickness or disease sustained by a person. This includes mental anguish, mental injury, shock, fright or death resulting from bodily injury, sickness or disease. . . .

> 14. "Personal and advertising injury" means injury, including consequential "bodily injury," arising out of one or more of the following offenses: . . .
>
> > d. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; . . .
> >
> > f. Misappropriation of advertising ideas or style of doing business; . . .

(Docket No. 12, Ex. 1).

In a later endorsement, Maryland Casualty Company altered the definition of "Personal and advertising injury" in the following manner:

> **PERSONAL AND ADVERTISING INJURY REDEFINED**
>
> This endorsement modifies provisions in the following:
>
> **COMMERCIAL GENERAL LIABILITY COVERAGE FORM**
>
> 1. Paragraph f. of the definition of personal and advertising injury in **SECTION V – DEFINITIONS** is deleted and replaced by the following:
>
> > **f.** The use of another's advertising idea in your "advertisement."

(Docket No. 12, Ex. 1).

After evaluating the parties' submissions on summary judgment, it is clear that a pure issue of law dictates the outcome in this case. That issue is whether the Vargo action's complaint alleged facts within its four corners sufficient to raise potential claims within the coverage afforded by the Policy and trigger defendants' duty to defend.

Plaintiffs contend the facts alleged in the Vargo complaint are sufficient to trigger defendants' duty to defend. They argue that the complaint shows that a false statement—that

7

Vargo entered into a residential lease on BCA's behalf—was made in a March 9, 2009, letter from the BCA members to Vargo. (Docket No. 37, p. 7). Plaintiffs contend that, in reality, the landlord mistakenly substituted BCA's name for Vargo's as the lessee. (Docket No. 37, p. 7). Plaintiffs believe this allegation is enough to show that Vargo could have advanced a defamation claim against BCA and his former co-members. (Docket No. 12, Ex. 1).

Plaintiffs additionally state that the Vargo complaint raises a potential claim that BCA used Vargo's advertising ideas after BCA terminated Vargo. The argument is that when BCA, which was Vargo's brainchild, expelled Vargo, BCA pilfered all of Vargo's BCA concepts by operating BCA without Vargo. (Docket No. 37, p. 9). Plaintiffs further posit that some of Vargo's ideas included advertising ideas falling under the Policy. (Docket No. 37, p. 9). Plaintiffs then argue that the definition of advertising in the Policy is ambiguous, requiring that the definition be liberally construed in Plaintiffs' favor. (Docket No. 37, p. 9). Plaintiffs therefore believe that the facts averred in the Vargo complaint match closely enough with the Policy's language to state a potential covered claim, even though the Vargo complaint does not contain or purport to state any defamation or misappropriation-like counts.

Defendants contend that the facts averred in the Vargo complaint do not raise any potential claims within the Policy's four corners and therefore the duty to defend was not triggered. (Docket No. 33, p. 13). From their perspective, the Vargo complaint could not be construed to state a defamation claim because it does not allege that the March 9, 2009, letter was published to anyone outside BCA's members. (Docket No. 33, pp. 9–10). Furthermore, the Vargo complaint assertedly contains no allegation that any of Vargo's advertising ideas were used in BCA's advertisements. (Docket No. 33, p. 11). And the Policy's advertising definition is not ambiguous, precluding the court's ability to liberally construe it in plaintiffs' favor.

8

(Docket No. 39, p. 14). Finally, defendants contend that even if the court were to find that the Vargo complaint's allegations are sufficient to trigger the duty to defend, the court must still rule in their favor because the Policy excludes coverage of the specific harms alleged by plaintiffs. (Docket No. 33, pp. 10, 12).

## IV. DISCUSSION

The duty to defend is separate and distinct from the duty to indemnify under Pennsylvania law. Erie Ins. Exch. v. Transamerica Ins. Co., 533 A.2d 1363, 1368 (Pa. 1987) ("[t]he duty to defend is a distinct obligation, separate and apart from the insurer's duty to provide coverage."). An insurer's obligation to defend is fixed solely by the allegations in the underlying complaint(s). Etna Cas. and Sur. Co., v. Roe, 650 A.2d 94, 98 (Pa. Super. 1994); Stidham v. Millvale Sportsman's Club, 618 A.2d 945, 953–54 (Pa. Super. 1993). An insurer has a duty to defend whenever the allegations in a complaint against its insured, when taken as true and construed in favor of the insured, set forth a claim which potentially falls within the coverage provided by the policy. Lucker Mfg. Inc., v. The Home Ins. Co., 23 F.3d 808, 821 (3d Cir. 1994); Cadwallader v. New Amsterdam Cas. Co., 152 A.2d 484, 488 (Pa. 1959).

The duty to defend is triggered even if the allegations against the insured are groundless, false or fraudulent. D'Auria v. Zurich Ins. Co., 507 A.2d 857, 859 (Pa. Super. 1986). It likewise arises when the potential for a covered claim exists and the determination of coverage depends upon the existence or non-existence of undetermined or disputed facts raised against the insured. Germantown Ins. Co., v. Martin, 595 A.2d 1172, 1174 (Pa. Super. 1991). Where a complaint raises a claim potentially within the scope of coverage, the duty to defend remains with the insurer until the claim is narrowed to one patently outside the policy coverage. Id. ("[a]s long as the complaint comprehends an injury which may be within the scope of the policy, Germantown

must defend Martin's estate until the claim is confined to a recovery the policy does not cover.") (citing United Servs. Auto. Ass'n. v. Elitzky, 519 A.2d 982 (Pa. Super. 1986), alloc. denied, 528 A.2d 957 (Pa. 1987)); Stidham, 618 A.2d at 953–54.

"It is not the actual details of the injury, but the nature of the claim which determines whether the insurer is required to defend." Etna Cas. and Sur. Co., 650 A.2d at 98 (quoting D'Auria, 507 A.2d at 859). The particular causes of action in the complaint also are "not determinative of whether coverage has been triggered. Instead, it is necessary to look at the factual allegations contained in the complaint." Mut. Benefit Ins. Co. v. Haver, 725 A.2d 743, 745 (Pa. 1999).

Moreover, the potential scope of coverage under an insurance policy must be examined before it can be determined whether a complaint potentially is covered by the policy. Lucker Mfg., Inc., 23 F.3d at 813. The inquiry into coverage is antecedent to ascertaining whether the duty to defend exists. Id. at 813–14 (citing Erie Ins. Exch. v. Transamerica Ins. Co., 533 A.2d 1363, 1368 (Pa. 1987)).

"Traditional principles of insurance policy interpretation control the inquiry into coverage." Lucker Mfg., Inc., 23 F.3d at 814. If the language of an insurance policy is clear and unambiguous, it must be given its ordinary meaning. Imperial Cas. and Indm. Co., v. High Concrete Structures, Inc., 858 F.2d 128, 131 (3d Cir. 1988). If a provision of the policy is ambiguous, the ambiguity is to be construed to afford coverage. Lucker Mfg., Inc., 23 F.3d at 814. A provision is ambiguous if, after considering it in the context of the entire policy, reasonable minds could differ as to its meaning. Imperial Cas. and Indm. Co., 858 F.2d at 131. However, strange or contrived readings of policy language are not to be undertaken to create an ambiguity where none exists, nor should a court attempt to rewrite policy language in a manner

that conflicts with the plain meaning of the words employed. Lucker Mfg., Inc., 23 F.3d at 814; Elitzky, 517 A.2d at 986.

### A. Scope of Coverage

The first step in determining if defendants had a duty to defend is to examine what the Policy covered. The parties focus on two potential forms of injury that are covered: defamation and the use of one's advertising ideas in another's advertisement. (Docket No. 33, p. 8). As to these forms of injury, the Policy provides:

> d. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;
>
> f. The use of another's advertising idea in your "advertisement."

(Docket No. 12, Ex. 1).

The above grants of coverage provide the backdrop needed to determine if the Vargo complaint's averments triggered defendants' duty to defend.

### B. Duty-to-Defend Analysis

A review of the Vargo complaint and the Policy's relevant provisions clearly reveals that defendants' duty to defend was not triggered. "The question of whether a claim against an insured is potentially covered is answered by comparing the four corners of the insurance contract to the four corners of the complaint." Am. and Foreign Ins. Co. v. Jerry's Sport Ctr., Inc., 2 A.3d 526, 541 (Pa. 2010). Only when "it is clear from an examination of the allegations in the complaint and the language of the policy that the claim does not potentially come within the coverage of the policy" may the insurer "refuse to defend a claim against its insured." Id. No allegations in the Vargo complaint provided a basis for defendants to recognize or infer a

potential defamation or misappropriation-of-advertising-idea claim. Therefore, defendants were not required to defend plaintiffs in the Vargo action.

   1.   *Defamation*

Plaintiffs' contention that an incorrect statement in a letter handed to Vargo on March 9, 2009, properly notifies defendants of a potential defamation claim is unavailing. The Vargo complaint states "[Vargo] was handed a letter identifying his "gross misconduct" as "entering into at least one agreement on behalf of BCA that [Vargo was] not permitted to enter into under the BCA Operating Agreement." (Docket No. 28, Ex. A, ¶ 17). Plaintiffs conclude that the letter contained a false statement because it states that Vargo entered BCA into an agreement (Vargo's residential lease), even though Vargo alleged that his landlord mistakenly identified BCA as the lessee. (Docket No. 28, Ex. A, ¶¶ 17–22).

Even if the March 9, 2009, letter contained a false statement about Vargo, this statement does not obligate defendants to defend. The Policy covers damages caused by "[o]ral or written publication of material that slanders or libels." (Docket No. 12, Ex. 1). Thus, the Policy does cover defamation claims.

The duty to defend in Pennsylvania is triggered "if the nature of the allegations and claims raised in the underlying complaint . . . arise out of the torts enumerated in the policy." Roman Mosaic & Tile Co. v. Aetna Cas. & Sur. Co., 704 A.2d 665, 669 (Pa. Super. 1997). A plaintiff successfully proving a defamation claim in Pennsylvania must show:

> "(1) the defamatory character of the communication; (2) its
> publication by the defendant; (3) its application to the plaintiff; (4)
> the understanding by the recipient of its defamatory meaning; (5)
> the understanding by the recipient of it as intended to be applied to
> the plaintiff; (6) special harm resulting to the plaintiff from its
> publication; and (7) abuse of a conditionally privileged occasion."

Elia v. Erie Ins. Exch., 634 A.2d 657, 659–60 (Pa. Super. 1993) (quoting 42 Pa.C.S.A. § 8343(a) (emphasis removed)).

Both the Policy and Pennsylvania defamation law require a defendant to "publish" an alleged defamatory statement before there can be liability. The specific grant of coverage in the Policy extends only to "[o]ral or written publication of material that slanders or libels." (Docket No. 12, Ex. 1). It is appropriate to use a dictionary when construing words of common usage such as "publish." See Am. Auto Ins. Co. v. Murray, 658 F.3d 311, 320 (3d Cir. 2011) (explaining how courts should evaluate the plain meaning of terms within insurance contracts under Pennsylvania law). Examining dictionary definitions of "publish" just eight years ago, Judge Nora Barry Fischer found that it means "made generally known, announced publically, disseminated to the public, or released for distribution." Whole Enchilada, Inc. v. Travelers Prop. Cas. Co. of Am., 581 F. Supp.2d 677, 697 (W.D. Pa. 2008) (determining the definition of "publish" in a commercial general liability insurance policy's personal-and-advertising-injury section). This definition of "publish" is applicable here as well.

The Vargo complaint does not allege that BCA or any of its members "published" the March 9, 2009, letter. It failed to set forth allegations that suggest or provide circumstances from which to infer that a publication occurred. At the very least, communications "must be expressed to a third party" to be published. Davis v. Res. For Human Dev., 770 A.2d 353, 358 (Pa. Super. 2001); see Gaetano v. Sharon Herald Co., 231 A.2d 753, 755 (Pa. 1967) (defining "publication" as communicating a defamatory matter "intentionally or by a negligent act to one other than the person defamed."). Nor is there any allegation that any third party saw or learned of the letter's contents. Thus, the Vargo complaint lacks any reference to or basis from which to infer publication, a necessary element for defamation claims under both the Policy and

13

Pennsylvania law. Since the Policy only covers published material that "slanders or libels" (Docket No. 12, Ex. 1), the Vargo complaint did not trigger defendants' duty to defend with regard to a potential defamation claim.

Of course, an insurer's duty to defend a defamation claim does not necessarily require the underlying complaint to allege that someone published a slanderous or libelous statement. "Courts must analyze coverage on a case-by-case basis." CAT Internet Sys., Inc. v. Providence Washington Ins. Co., 153 F. Supp.2d 755, 761 (W.D. Pa. 2001) aff'd sub nom 333 F.3d 138 (3d Cir. 2003). It is sufficient here to determine that the Vargo action did not present a purported basis from which to infer that the litigation would progress to include a defamation claim or that one already was subsumed within the claims presented. Therefore, the court need not venture into unknown territory by declaring the specific number of elements of an unsubstantiated tort that an underlying complaint must contain in order to trigger an insurer's duty to defend.

  2.  *Misappropriation of Advertising Ideas*

The Vargo complaint likewise failed to contain factual allegations regarding the use of advertising ideas. The Policy covers damages from "[t]he use of another's advertising idea in your 'advertisement.'" (Docket No. 12, Ex. 1). The Policy defines "advertisement" as "a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters." (Docket No. 12, Ex. 1). Pennsylvania courts describe an "'advertising idea' as an idea for advertising that is 'novel and new,' and 'definite and concrete,' such that it is capable of being identified as having been created by one party and stolen or appropriated by another." Sorbee Int'l Ltd. v. Chubb Custom Ins. Co., 735 A.2d 712, 714 (Pa. Super. 1999) (quoting Thomas v. R.J. Reynolds Tobacco Co., 38 A.2d 61, 62–63 (Pa. 1944)). The Third Circuit has opined that an "advertising

14

idea" is a "method[] for gaining customers." Frog, Switch & Mfg. Co. v. Travelers Ins. Co., 193 F.3d 742, 748 (3d Cir. 1999) (differentiating between misappropriating advertising ideas and trade secrets in examining the scope of coverage under a standard commercial general liability policy). Allegations in the Vargo complaint must at least give rise to the contention that BCA used one of Vargo's advertising ideas in its advertisements without his permission. They do not.

The Vargo complaint similarly fails to allege facts corresponding to any forms of covered advertising damages in the Policy. The cause of action best corresponding to using "another's advertising idea in your 'advertisement'" (Docket No. 12, Ex. 1), is the common-law tort of misappropriation. Pennsylvania courts recognize this tort, which consists of three elements:

> (1) the plaintiff has made a substantial investment of time, effort and money into creating the thing misappropriated such that the court can characterize that thing as a kind of property right, (2) the defendant has appropriated the thing at little or no cost, such that the court can characterize defendant's actions as reaping [what] it has not sown, and (3) the defendant has injured plaintiff by the misappropriation.

Sorbee, 735 A.2d at 716 (internal quotation marks omitted).

The Vargo complaint does not allege any misappropriation elements. It fails to contain any allegation about a particular advertising idea Vargo created, let alone one that BCA appropriated in a manner injuring Vargo. Thus, it lacks any reasonable basis to even infer that such a claim might surface in the underlying litigation.

In their attempt to show that Vargo alleged his advertising ideas were snatched and used in BCA's advertisements, plaintiffs make a multi-step argument. They zero in on the Vargo complaint's allegations that Vargo: created the concept of "starting and operating a school for hair styling, cosmetology and related services"; used his "best efforts, skills and knowledge" to build BCA's business; procured the required licenses to open BCA's two schools; and was

15

excluded from BCA beginning on March 9, 2009, which continued "to operate under licenses held in [Vargo's] name." (Docket No. 28, pp. 6–8, ¶¶ 9, 15, 23). Plaintiffs then make three assumptions. First, they assert that "[s]ome communication to the outside public reasonably must [have occurred] to sell BCA." (Docket No. 37, p. 6). Second, plaintiffs add that "BCA, its licensure and all other things that constitute the outward appearance of BCA to the public allegedly belonged to or were created by Vargo." (Docket No. 37, p. 6). Third, Plaintiffs posit that "[Vargo's] concepts are outward manifestations of BCA—otherwise an advertisement." (Docket No. 37, p. 6). None of these assertions are made or even alluded to in the Vargo complaint.

Of course, materials outside the Vargo complaint are not to be considered when determining whether defendants had a duty to defend. The Pennsylvania Supreme Court's "well-established precedent . . . requir[es] that an insurer's duty to defend . . . be determined solely from the language of the complaint against the insured." Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Comm. Union Ins. Co., 908 A.2d 888, 896 (reversing the Pennsylvania Superior Court for "looking beyond the allegations raised" in the underlying complaint in determining whether the duty to defend was triggered). Plaintiffs' assumptions regarding BCA improperly using Vargo's advertising ideas are beyond any reasonable reading of Vargo's complaint. (See Docket No. 37, p. 6). Because the advertising-idea assertions by plaintiffs are not in Vargo's complaint, they must be disregarded in the duty-to-defend context.

Plaintiffs characterize defendants as "demand[ing] that the [underlying] [c]omplaint contain magic language that fits squarely within" their interpretation of the policy language. (Docket No. 40, p. 3). But no talismanic formulas are needed. The factual allegations within the complaint must be sufficient to perceive a potentially coverable claim. See Am. and Foreign Ins.

Co. v. Jerry's Sport Ctr., Inc., 2 A.3d 526, 541 (Pa. 2010); Cadwallader v. New Amsterdam Cas. Co., 152 A.2d 484, 488 (Pa. 1959). The Vargo complaint does not present such a scenario. Defendants, therefore, had no duty to defend based on the coverage afforded for advertising injury.

**V.  CONCLUSION**

For the foregoing reasons, the complaint's allegations are insufficient to trigger defendants' duty to defend. It follows that defendants' motion for summary judgment must be granted and plaintiffs' motion for summary judgment must be denied. Appropriate orders will follow.

Date: September 30, 2016

                                                  s/David Stewart Cercone
                                                  David Stewart Cercone
                                                  United States District Judge

cc:    Julian E. Neiser, Esquire
       Brigid Q. Alford, Esquire

       (*Via CM/ECF Electronic Mail*)